16 Neb. App. 878
STATE OF NEBRASKA, APPELLEE.
v.
ALLEN J. WILSON, ALSO KNOWN AS ALFRED J. WILLIAMS, APPELLANT.
No. A-07-626.
Court of Appeals of Nebraska.
Filed August 5, 2008.
Michael J. Decker, of Decker Law Offices, for appellant.
Jon Bruning, Attorney General, Erin E. Leuenberger, and James D. Smith for appellee.
INBODY, Chief Judge, and IRWIN and CARLSON, Judges.
IRWIN, Judge.

I. INTRODUCTION
Allen J. Wilson, also known as Alfred J. Williams, appeals his six felony convictions and sentences. Wilson challenges, among other things, the trial court's denying the admissibility of evidence regarding two eyewitness' prior out-of-court identifications of a person other than Wilson as the perpetrator.
The evidence at issue consists of out-of-court statements made by the victims and the lead detective on the case, Det. Terry Iselin. The statements of these three witnesses would have addressed the question of whether the victims had previously identified someone other than Wilson during a photographic lineup conducted by Iselin. Wilson argues that testimony regarding the prior out-of-court identifications constituted evidence of prior inconsistent statements and that, as such, the testimony should have been admissible for impeachment purposes. We find that the statements were hearsay and that the foundation laid or omitted during trial did not qualify such statements as prior inconsistent statements; therefore, the statements could not be used for impeachment purposes.

II. BACKGROUND
Wilson's convictions and sentences stem from a "home invasion" robbery which occurred on February 3, 1998. On that day, two armed men forced their way into Thomas Johnson's residence. At the time, he resided with his girlfriend, Tanyel Smith, and their two young daughters. The two men bound Johnson and Smith with duct tape in the living room of the residence. While Johnson and Smith were bound, the men poured lighter fluid on them and threatened to put them in the bathtub and light them on fire if the couple did not tell the men where "the money" was or if anyone called the police.
While Johnson and Smith were bound in the living room, the couple's two daughters were in a nearby bedroom. One of the perpetrators pointed his gun at the young girls and told them not to leave the room or try to call for help. The perpetrators ultimately left the residence after taking $5,000 cash and Smith's car.
After the perpetrators left, Smith called the police. When the police arrived, Smith informed them that she had recognized one of the men to be James Williams. The police later arrested James Williams and interviewed him on February 3, 1999. During the interview, he identified his accomplice as his uncle whom he knew as "Alfred Williams." He then gave police a physical description of his uncle.
Police subsequently contacted the Department of Correctional Services and located a photograph of a person who matched the description of "Alfred Williams." The Department of Correctional Services identified the person in the photograph as "Allen J. Wilson." Police showed the photograph of Wilson to James Williams. James Williams stated that the photograph depicted his uncle, "Alfred Williams," who had assisted him in the 1998 robbery.
Based on the above information, the county court issued a warrant for Wilson's arrest, and the State filed four one-count complaints based on the above-described acts. The complaints, dated February 12, 1999, charged Wilson with two counts of robbery and two counts of use of a deadly weapon to commit a felony.
On June 9, 2005, Wilson made his first appearance in county court on the charges. On July 15, the county court held a preliminary hearing, and the matter was bound over to the district court. On July 19, the State filed an information charging Wilson with two counts of robbery and two counts of use of a deadly weapon to commit a felony, all counts arising out of acts committed on February 3, 1998. Pursuant to amendments to the information, filed on August 3 and December 30, 2005, two counts of false imprisonment in the first degree were added to Wilson's charges. In addition, the State alleged that Wilson was a habitual criminal.
On January 20, 2006, Wilson filed a motion for discharge. The motion alleged that the failure to prosecute the matter within 6 months of filing the original action in the county court and within 6 months of the filing of the information denied him his statutory right to a speedy trial and that the failure to prosecute the matter for 7 years denied him his federal and state constitutional rights to a speedy trial.
During the hearing on Wilson's motion for discharge, his counsel conceded that the statutory speedy trial time had not run based on the time the information was filed in district court. With respect to the constitutional speedy trial right, Wilson's counsel argued that Wilson's defense would suffer prejudice by the delay, because "if and when alibi witnesses are called, we believe the State is going to attack the witnesses's credibility based on the length of time it's been since the incident occurred and remembering back as far as when [Wilson] was in California, et cetera." The State asserted that law enforcement officers performed a diligent search for Wilson, that the warrant for his arrest remained active until Wilson was arrested in the Douglas County area, and that the time for a speedy trial did not begin to run until the information was filed on July 19, 2005.
In an order filed January 25, 2006, the court overruled Wilson's motion for discharge. The court ruled that the statutory speedy trial right had not been violated and that Wilson had not been prejudiced by the delay.
On January 30, 2006, trial commenced on the matter. At trial, the key issue in contention was whether or not Wilson was, in fact, the second perpetrator of the home invasion. Wilson defended the charges by asserting that he had been in California on February 3, 1998, when the robbery was committed.
The only evidence the State presented regarding whether or not Wilson was the second perpetrator of the robbery was the testimony of the two adult victims, Johnson and Smith. Both Johnson and Smith testified that during the robbery, they had the opportunity to look at the second perpetrator. Smith testified that she looked at the man "long enough to make him mad." She testified that the man told her to get down and stop looking at him. During their trial testimony, both Johnson and Smith identified Wilson as the second perpetrator and both testified that there was no doubt in their minds that Wilson was the person who robbed them.
After Johnson and Smith identified Wilson as the perpetrator, Wilson's counsel attempted to elicit testimony from each of them about whether or not they had ever identified someone else as the second perpetrator. The State objected to this line of questioning, and the trial court ruled that evidence of Johnson's and Smith's prior out-of-court identifications was inadmissible. The specific circumstances and facts surrounding the trial court's rulings will be discussed in detail below.
At the conclusion of the evidence, the jury found Wilson guilty of two counts of robbery, two counts of use of a deadly weapon to commit a felony, and two counts of false imprisonment in the first degree. After the verdicts were rendered, the trial court held a hearing and determined that Wilson was a habitual criminal. The court then sentenced Wilson to a term of imprisonment of 10 to 20 years for each count of robbery and each count of use of a deadly weapon to commit a felony and a term of imprisonment of 10 to 10 years for each count of false imprisonment. Wilson appeals his convictions and sentences here.

III. ASSIGNMENTS OF ERROR
On appeal, Wilson assigns and argues four errors. First, Wilson asserts that the trial court erred in rulings regarding the admissibility of evidence of Johnson's and Smith's prior out-of-court identifications of a different person as the perpetrator. Second, Wilson asserts that the trial court erred in not permitting extrinsic evidence of a prior inconsistent statement of Smith from a previous hearing. Third, Wilson asserts that the trial court erred in denying his motion to discharge and in finding that his constitutional right to a speedy trial was not violated. Fourth, Wilson asserts that the sentences imposed by the court were excessive.
Wilson also assigns as error the admission of hearsay testimony over his objection. However, Wilson does not specifically argue this assignment of error in his brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. Olivotto v. DeMarco Bros. Co., 273 Neb. 672, 732 N.W.2d 354 (2007). We therefore will not consider this additional assignment of error.

IV. ANALYSIS

1. ADMISSIBILITY OF PRIOR IDENTIFICATION TESTIMONY
Wilson asserts that the trial court erred in finding certain evidence to be inadmissible hearsay. The evidence at issue consists of out-of-court statements made by the victims, Johnson and Smith, and the lead detective on the case, Iselin. The inadmissible statements of these three witnesses would have addressed the question of whether Johnson and Smith had previously identified someone other than Wilson as the second perpetrator during a photographic lineup conducted by Iselin. In his brief, Wilson argues that testimony regarding the prior out-of-court identifications constituted evidence of prior inconsistent statements and that, as such, the testimony should have been admissible for impeachment purposes. In light of the foundation laid or omitted during trial to qualify such statements as prior inconsistent statements, we find that the trial court did not abuse its discretion in ruling that the statements were inadmissible.

(a) Are Out-of-Court Identifications Hearsay?
[1] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. State v. Kuehn, 273 Neb. 219, 728 N.W.2d 589 (2007).
While the Nebraska Evidence Rules have several counterparts in the Federal Rules of Evidence, or are otherwise patterned on the federal rules, the Nebraska Evidence Rules and the Federal Rules of Evidence differ in their treatment of evidence regarding an out-of-court identification. Under the federal rules, statements regarding an out-of-court identification are considered nonhearsay. Fed. R. Evid. 801(d) provides: "Statements which are not hearsay. A statement is not hearsay if (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (C) one of identification of a person made after perceiving the person. . . ."
[2] To the contrary, Neb. Evid. R. 801(4)(a) does not contain such classification and provision and, in fact, makes no mention whatsoever concerning witness identification as a nonhearsay statement. In addition, none of the other Nebraska rules of evidence or other Nebraska statutes authorize admissibility of a witness' pretrial identification of a defendant as a nonhearsay statement or statement otherwise exempted or excluded from the operation and purview of the "hearsay rule," Neb. Evid. R. 802, prohibiting admission of hearsay. See State v. Salamon, 241 Neb. 878, 491 N.W.2d 690 (1992). Accordingly, in the absence of admissibility authorized under the Nebraska Evidence Rules or by other statute, a witness' pretrial statement identifying a defendant as the perpetrator of a crime is hearsay pursuant to rule 801(3) and, therefore, is inadmissible as the result of rule 802. State v. Salamon, supra.
It is clear, then, that any testimony regarding Johnson's and Smith's out-of-court identifications of someone other than Wilson as the perpetrator of the robbery constituted inadmissible hearsay. However, classifying the testimony as inadmissible hearsay does not end our inquiry. While testimony regarding the out-of-court identifications is not admissible as substantive evidence, the testimony may be admissible as impeachment evidence.

(b) Use of Hearsay Statement as Prior Inconsistent Statement
[3] One way to impeach a witness' credibility is to show that the witness previously made a statement contradictory to what he or she testified to at trial. Prior inconsistent statements of a witness are admissible as impeachment evidence. State v. Rodriguez, 272 Neb. 930, 726 N.W.2d 157 (2007). However, such prior inconsistent statements are admitted solely for the purpose of discrediting the reliability of the witness. They are not admissible as substantive evidence of the facts stated. See State v. Isley, 195 Neb. 539, 239 N.W.2d 262 (1976).
At trial, Wilson's counsel argued that the testimony regarding Johnson's and Smith's out-of-court identifications was admissible as a prior inconsistent statement because both parties had identified Wilson in court as the perpetrator of the robbery. We now analyze whether testimony about Johnson's and Smith's out-of-court identifications amounted to evidence of prior inconsistent statements which would be admissible as impeachment evidence. In conducting our analysis of this question, we first summarize the foundation offered to demonstrate that Johnson's and Smith's out-of-court identifications were inconsistent with their in-court identifications of Wilson as the perpetrator.

(i) Foundational Questioning About Johnson's Out-of-Court Identification
During his cross-examination of Johnson, Wilson's counsel asked Johnson about the photographic lineup conducted by police after the robbery. Wilson's counsel asked: "And when you looked at those photos, you identified someone as being the person that robbed you; is that correct?"; "Sir, were you asked by the detective whether or not the  anyone in the photo array in this photo spread resembled the person that robbed you; is that correct?"; and "Did you identify someone in the photo array?" Before Johnson could respond to any of the above questions, the State objected on hearsay grounds and the court sustained the objection.

(ii) Foundational Questioning About Smith's Out-of-Court Identification
When cross-examining Smith, Wilson's counsel asked Smith whether the police had shown her a photographic lineup relating to the second perpetrator of the robbery. Smith testified that she did not remember being shown such a lineup. Wilson's counsel did not pursue the line of questioning any further with her.

(iii) Foundational Questioning About Iselin's Out-of-Court Statement
During his case in chief, Wilson called Iselin to testify. Iselin was the lead detective for the investigation of the robbery and, as a part of his investigation, had shown Johnson and Smith a photographic lineup to help them identify the second perpetrator of the robbery. Defense counsel questioned Iselin as follows:
Q. And in this second photo array, was the photo of Mr. Williams present in that photo array?
A. No.
Q. Okay. All the individuals in that photo array were someone other than Mr. Williams  or Mr. Alfred Williams, correct, the one you put together?
A. Yes.
Q. And Mr. James Williams was not  his photograph was not in that photo array, correct?
A. Correct.
After questioning Iselin regarding whether "Williams" appeared in the photographic array, Wilson's counsel attempted to question him regarding Johnson's and Smith's prior out-of-court identifications of someone other than Wilson as the second perpetrator of the robbery. The State objected to the questions regarding the prior identification on hearsay grounds, and the court sustained the objections.

(c) Analysis of Counsel's Questions of Johnson to Determine Admissibility as Prior Inconsistent Statement
We now turn to our analysis of whether counsel's foundational questions regarding Johnson's prior out-of-court identification established inconsistency between Johnson's out-of-court identification statements and in-court identification of Wilson as the second perpetrator. During his cross-examination of Johnson, Wilson's counsel first asked Johnson: "And when you looked at those photos, you identified someone as being the person that robbed you; is that correct?" Based on our discussion above, the response to this question would clearly be hearsay because it would be a witness' out-of-court statement identifying a person as the perpetrator of a crime. However, Wilson does not contest the trial court's determination that the answer to this question would be inadmissible hearsay. Rather, he asserts that the answer to the question would be admissible as a prior inconsistent statement of Johnson's in-court identification of Wilson as the perpetrator.
[4] We do not find that the answer to counsel's question would necessarily be inconsistent with Johnson's in-court identification of Wilson. In determining whether subsequent evidence or testimony constitutes impeachment, a trial judge has the discretion to determine whether the testimony is inconsistent, and, absent an abuse of that discretion, the ruling will be upheld on appeal. First Nat. Bank in Mitchell v. Kurtz, 232 Neb. 254, 440 N.W.2d 432 (1989). See, also, State v. Marco, 220 Neb. 96, 368 N.W.2d 470 (1985). Upon our review of the record, we cannot say that the court abused its discretion in prohibiting Johnson from responding to counsel's question about whether he identified "someone" in the lineup. We do not find sufficient evidence regarding who appeared in the lineup, the physical features of those individuals appearing in the lineup, or the circumstances surrounding the lineup to demonstrate that Johnson's response to such a question would be inherently inconsistent with his prior testimony identifying Wilson as the second perpetrator.
First, we note that while there is some evidence that Wilson did not appear in the photographic lineup, this evidence is unclear. Counsel asked Iselin about the persons depicted in the photographic array. Counsel first asked, "And in this second photo array, was the photo of Mr. Williams present in that photo array?" Iselin testified that "Williams" did not appear in the lineup. It is not clear from this question whether counsel is referring to James Williams, Wilson's nephew and alleged accomplice, or to Alfred Williams, which is an alias of Wilson's. Accordingly, this question does not sufficiently demonstrate that Wilson did not appear in the lineup and that, consequently, if Johnson identified "someone," the identification would have to have been of someone other than Wilson.
Counsel next asked Iselin, "Okay. All the individuals in that photo array were someone other than Mr. Williams  or Mr. Alfred Williams, correct, the one you put together?" Iselin responded, "Yes." While counsel appears to be attempting to ask Iselin whether Alfred Williams appeared in the lineup, the question is confusing. Within the question, counsel first asks if all of the individuals in the photographs were people other than "Mr. Williams." Again, we do not know whether counsel is referring to James Williams or Alfred Williams. Counsel then changes the question to refer to "Mr. Alfred Williams." While the name Alfred Williams refers to the defendant, it is unclear whether the jury would have understood this reference. Wilson was introduced to the jury as both Allen Wilson and Alfred Williams; he was referred to by both names during the trial. The jury also received information about James Williams, Wilson's nephew. Given this confusion regarding Wilson's name and regarding the differentiation between Wilson and James Williams, we do not find that counsel's questions to Iselin clearly and unequivocally established that Wilson was not present in the photographic lineup.
Furthermore, we note that there is no evidence regarding the physical features of persons appearing in the lineup or regarding Wilson's physical features. Without such evidence, it is difficult to make an assessment about the actual inconsistency between Johnson's out-of-court identification of "someone" and his in-court identification of Wilson.
Finally, there is evidence that Iselin struggled to remember specific details about the circumstances surrounding the lineup. In fact, the record indicates that he could testify only to the information included in his police report regarding the robbery. From the record, it appears that he had little independent recollection of the photographic lineup, itself, or of Johnson's identification. This would be consistent with the fact that the events he was testifying about occurred approximately 8 years prior to trial.
Because there is insufficient evidence to establish who was pictured in the lineup, the physical features of the persons in the lineup, and the precise circumstances surrounding the lineup, we cannot say that the trial court abused its discretion in determining that Johnson's answer to this question would not necessarily provide any information inconsistent with his previous testimony that Wilson was the second perpetrator. Accordingly, we find that the court did not err in sustaining the State's objection to this question.
Counsel next asked Johnson: "Sir, were you asked by the detective whether or not the  anyone in the photo array in this photo spread resembled the person that robbed you; is that correct?" Again, the response to this question would be hearsay. In order to answer the question, Johnson would have to provide testimony of an out-of-court statement made by the detective. Moreover, the answer to this question would not be inconsistent with any of Johnson's previous testimony, because the question only asks if Johnson was asked whether or not a person in the photographic spread resembled the person that robbed him. The question would not elicit any testimony which would suggest that Johnson previously identified someone other than Wilson as the perpetrator. Accordingly, we find that the court did not err in sustaining the State's objection to this question.
Finally, counsel asked Johnson: "Did you identify someone in the photo array?" This question is very similar to the first question asked of Johnson on this topic. The response to the question would elicit hearsay testimony and would not necessarily provide any inconsistencies with Johnson's prior testimony. As we discussed more thoroughly above, because there is insufficient evidence regarding the individuals pictured in the lineup and regarding the circumstances surrounding Johnson's viewing of the lineup, whether Johnson identified "someone" in the lineup does not directly contradict his prior in-court identification of Wilson as the second perpetrator. If counsel had asked Johnson whether he had identified someone other than Wilson in the photographic lineup or whether he had ever identified someone other than Wilson as the second perpetrator, then Johnson's answers would be admissible as prior inconsistent statements. Such types of questions were not asked.
Based on our review of counsel's questioning of Johnson regarding the prior out-of-court identification, we find that the court did not err in sustaining the State's objections to this line of questioning or in prohibiting Johnson from answering the questions. Counsel's questions would have elicited inadmissible hearsay testimony and would not necessarily have elicited any inconsistency between Johnson's in-court testimony and any out-of-court identification. As such, the court did not abuse its discretion in determining that the responses to the questions were not admissible as evidence of a prior inconsistent statement.
After the court sustained the State's objections to this line of questioning, Wilson's counsel made an offer of proof regarding Johnson's prior out-of-court identification as follows:
Q. Sir, you were shown a photo spread by Detective Iselin; is that correct?
A. Yes.
Q. And you  after reviewing that photo spread, you identified a party in a certain position; is that correct? A. No, I didn't.
Q. You did not?
A. No.
Q. Did you say that that's him?
A. No, I didn't.
Q. Okay. And so if Detective Iselin's report indicated otherwise, that would be incorrect?
A. Yes.
We first note that counsel asked different questions of Johnson during the offer of proof than he did during his cross-examination of Johnson. We also note that the first question in the offer of proof would have been admissible if offered at the trial because it did not elicit any hearsay testimony. The other testimony in the offer of proof demonstrates only that, while Johnson remembers viewing a photographic lineup, he does not believe that he identified any particular person in the photographs as being the perpetrator of the robbery. The offer of proof contains no information inconsistent with the testimony that Johnson gave in court. In fact, the questions that Wilson's counsel asked during the offer of proof could not have elicited inconsistency with Johnson's prior testimony. As discussed above, whether or not Johnson identified "a party" from a photographic lineup is not inherently inconsistent with his trial testimony that Wilson was the perpetrator of the robbery. Because there was no inconsistency between Johnson's trial testimony and his testimony presented in the offer of proof, the trial court did not err in excluding from evidence Johnson's testimony about the photographic lineup.

(d) Analysis of Counsel's Questions of Smith to Determine Admissibility as Prior Inconsistent Statement
We next analyze whether counsel's foundational questions regarding Smith's out-of-court identification statements established any inconsistency between the out-of-court identification and the in-court identification of Wilson as the second perpetrator of the robbery. As we discussed above, counsel asked Smith only whether the police had shown her a photographic lineup relating to the second perpetrator of the robbery. Smith testified that she did not remember being shown such a lineup, and counsel did not question her any further about this issue.
Because counsel did not ask Smith any further questions about the lineup after she stated that she did not remember being shown such a lineup, he did not elicit any information which would be inconsistent with Smith's previous testimony identifying Wilson as the second perpetrator. Additionally, we note that in his brief, Wilson generally asserts that the district court erred in finding evidence of Johnson's and Smith's out-of-court identification statements to be inadmissible; however, his brief focuses primarily on Johnson's out-of-court statements. As such, we find that Wilson's assertions regarding evidence of Smith's out-of-court identification have no merit.

(e) Analysis of Counsel's Questions of Iselin to Determine Admissibility as Prior Inconsistent Statement
Wilson also argues that Iselin's testimony about Johnson's and Smith's out-of-court identifications of someone other than Wilson as the perpetrator should have been admitted as impeachment evidence. We disagree.

(i) Iselin's Testimony About Johnson's Out-of-Court Identifications
Wilson's counsel presented an offer of proof regarding Iselin's testimony about Johnson's out-of-court identification. The offer of proof reveals that Iselin would have testified that, when shown a photographic lineup, Johnson identified someone named "Daniel Mitchell" as the second perpetrator of the robbery.
In his brief, Wilson is unclear about why Iselin's testimony should be considered a prior inconsistent statement. However, we consider two arguments which Wilson appears to argue in his brief. First, we examine whether Iselin's testimony about Johnson's out-of-court statements would be evidence of a prior inconsistent statement when viewed in light of Johnson's offer of proof testimony. We next examine whether Iselin's testimony would be evidence of a prior inconsistent statement when viewed in light of Johnson's in-court identification of Wilson as a perpetrator of the robbery.

a. Possible Inconsistency With Johnson's Offer of Proof Testimony
To the extent that Wilson asserts that Iselin's testimony is a prior inconsistent statement offered to impeach Johnson's offer of proof testimony, his contention is without merit. While Iselin's statements that Johnson did, in fact, identify someone from the photographic lineup are directly contradictory to Johnson's statements that he did not identify any particular person from the lineup as the perpetrator, Johnson's statements were correctly ruled inadmissible and were not put in evidence for the jury to consider.
As we discussed more fully above, Johnson's answers to the questions in the offer of proof did not produce any inconsistency with his prior trial testimony identifying Wilson as the perpetrator of the robbery. Accordingly, the testimony in the offer of proof was not admissible as evidence of a prior inconsistent statement. Because the offer of proof testimony was not admissible, Iselin's testimony cannot be admissible as evidence of an inconsistency between the offer of proof testimony and Johnson's prior out-of-court identification statements.

b. Possible Inconsistency With Johnson's In-Court Identification of Wilson
To the extent Wilson asserts that Iselin's testimony is a prior inconsistent statement offered to impeach Johnson's in-court identification of Wilson, his contention is, again, without merit.
As we discussed above, counsel's questioning of Johnson regarding the prior out-of-court identification was problematic. Counsel did not sufficiently develop Johnson's testimony regarding whether or not he had ever previously identified anyone other than Wilson as the second perpetrator of the robbery. As a result, counsel was not able to elicit any testimony regarding the circumstances or particulars of the photographic lineup in question. We also note that there is no evidence from any source regarding Wilson's physical characteristics or the physical characteristics of the individuals appearing in the photographic lineup. Based on these circumstances, we cannot say that Iselin's testimony that Johnson previously identified someone else as either looking like or being the perpetrator of the robbery is necessarily inconsistent with Johnson's in-court identification of Wilson. As such, we conclude that the trial court did not abuse its discretion in ruling that Iselin's testimony regarding the out-of-court identification was inadmissible.

(ii) Iselin's Testimony About Smith's Out-of-Court Identifications
As stated in Iselin's offer of proof testimony, Smith also identified a man named "Daniel Mitchell" as the second perpetrator of the robbery. While she was initially not positive about this identification, after discovering that Johnson also picked Mitchell out of the lineup, she did eventually state that she was fairly certain that Mitchell was one of the robbers.
Again, Wilson is not clear about why Iselin's offer of proof testimony regarding Smith's out-of-court identification of Mitchell is admissible as a prior inconsistent statement. For the sake of our analysis, we assume that Wilson is asserting that Iselin's offer of proof testimony would be evidence of an inconsistency between Smith's testimony at trial stating that she did not remember participating in the lineup or her testimony identifying Wilson as the perpetrator and her out-of-court identification.

a. Possible Inconsistency With Smith's Memory of Photographic Lineup
During counsel's cross-examination of Smith, she testified that she did not remember participating in a lineup to identify the second perpetrator. While Iselin testified that Smith did, in fact, participate in a lineup to identify the second perpetrator of the robbery, this testimony is not necessarily directly inconsistent with Smith's testimony that she did not remember such a lineup. We first note that counsel did not attempt to refresh Smith's memory of the lineup, nor did he question her further on the topic of a prior out-of-court identification. In light of the fact that the robbery occurred approximately 8 years prior to the time of the trial, we cannot say that the court abused its discretion in ruling that Iselin's testimony that Smith did participate in the lineup was inadmissible.

b. Possible Inconsistency With Smith's In-Court Identification of Wilson
To the extent that Wilson asserts that Iselin's testimony that Smith identified Mitchell as the robber is inconsistent with her in-court identification of Wilson, we find the assertion to be without merit. As we discussed above in relation to Iselin's offer of proof testimony about Johnson's out-of-court identification, there was no evidence regarding the circumstances or particulars of the photographic lineup in question. There is no evidence regarding Wilson's physical characteristics or the physical characteristics of the individuals appearing in the photographic lineup. In addition, there is no clear and unequivocal evidence about whether or not Wilson even appeared in the photographic lineup. Based on these circumstances, we cannot say that Iselin's testimony that Smith previously identified someone else as either looking like or being the perpetrator of the robbery is necessarily inconsistent with her in-court identification of Wilson.

(f) Conclusion Regarding Admissibility of Prior Identification Testimony
We conclude that the trial court did not abuse its discretion in ruling that evidence of Johnson's and Smith's out-of-court identification statements was inadmissible. Such statements were clearly hearsay and, based on counsel's foundational questioning of Johnson, Smith, and Iselin, the statements were not necessarily inconsistent with Johnson's and Smith's in-court identifications of Wilson as one of the robbers. This assertion is without merit.

2. ADMISSIBILITY OF PRIOR INCONSISTENT STATEMENT FROM PRELIMINARY HEARING
Wilson next asserts that the trial court erred in ruling that Smith's testimony from a preliminary hearing regarding whether or not the second perpetrator removed his sunglasses during the robbery was not admissible. Wilson asserts that such evidence was admissible because Smith's prior statements were given under oath and Smith was given an opportunity to explain the prior inconsistent statement. Upon our review of Wilson's proffered evidence about the inconsistent statement, we conclude that the court did not err in ruling the evidence to be inadmissible.
At trial, Smith testified that the second perpetrator of the robbery took off his sunglasses at some point during the incident and that she was able to get a good look at his face. On cross-examination, Wilson's counsel asked Smith whether she remembered testifying at a preliminary hearing. Smith responded that she did remember testifying at the hearing; however, after Wilson's counsel questioned her further, she stated that she did not remember the specific questions asked of her during the preliminary hearing, nor did she recall testifying that the robber kept his sunglasses on the entire time she saw him.
Before Wilson rested his case, his counsel attempted to offer into evidence a portion of Smith's testimony from a preliminary hearing regarding whether or not the perpetrator had his sunglasses on throughout the robbery. The State objected to the admission of the evidence, and the court sustained the objection.
We reproduce the first page of the proffered exhibit in its entirety here:
Q- And black sun  he was wearing black sun glasses?
A- Right.
Q- Were they tinted at all?
A- What  just  yes. He had the dark plastic sun glasses.
Q- You couldn't see through them. Correct?
. . . A- No, I couldn't see like (indiscernible).
This portion of the exhibit does not include any notation about who is asking the questions, who is answering the questions, or who was wearing the sunglasses. Additionally, there is no testimony referencing whether or not the second perpetrator wore the sunglasses throughout the robbery. As a result, this portion of the proffered exhibit cannot be considered inconsistent with Smith's trial testimony that the perpetrator took off his sunglasses at some point during the robbery.
The proffered exhibit contained a second page. We reproduce that page in its entirety here:
Officer Leland D. Cass  Direct
Q- And he didn't take them off. Right?
A- No.
We first note that it appears that this part of the exhibit is testimony by Officer Leland D. Cass, not by Smith. Furthermore, we note that the two lines reprinted on the page are provided without any further contextual information. We cannot discern who is being spoken about, nor can we discern what is being referred to in the question. As such, this portion of the proffered exhibit also cannot be considered a statement which is inconsistent with Smith's trial testimony. The exhibit indicates that this is not even Smith's preliminary hearing testimony, as Wilson's counsel asserted to the trial court.
Because the proffered exhibit does not demonstrate any inconsistency between Smith's trial testimony and her preliminary hearing testimony, the trial court did not err in ruling that the exhibit was inadmissible. We affirm the decision of the trial court.

3. CONSTITUTIONAL RIGHT TO SPEEDY TRIAL
Wilson next argues that the district court erred in overruling his motion to discharge and in finding that his constitutional right to speedy trial was not violated. Specifically, Wilson alleges that he was prejudiced by the 7-year delay between the time the State filed the initial complaint in county court and the time of his trial in district court. In clarifying precisely how the delay prejudiced him, Wilson points out that the State attacked his alibi witness' credibility because of the length of time that had passed between the crime and the time of trial. In addition, Wilson argues the long delay resulted in the jurors' speculating that he had been a "fugitive from justice" and that his failure to appear and respond to the charges implied a "consciousness of guilt." Brief for appellant at 12.
Upon our review of the record, we find that there has been no violation of Wilson's constitutional right to a speedy trial under the federal or state constitutions. We affirm the decision of the district court overruling Wilson's motion to discharge.
Before we conduct an analysis of Wilson's allegations, we first note that Wilson appeals only from the trial court's finding that his constitutional right to a speedy trial was not violated. Wilson previously conceded that his statutory right to a speedy trial was not violated.
We also note that Wilson previously appealed to this court the trial court's finding regarding his constitutional right to a speedy trial. See State v. Wilson, 15 Neb. App. 212, 724 N.W.2d 99 (2006). Wilson filed his initial appeal after his trial, but before sentencing. We determined that we lacked jurisdiction to consider Wilson's appeal, because Wilson had not yet been sentenced and, thus, there was not a final, appealable order in the case. In concluding that we lacked jurisdiction, we noted that unlike the statutory right to a speedy trial, "the constitutional right to a speedy trial can be effectively vindicated in an appeal after judgment." Id. at 221, 724 N.W.2d at 107. Accordingly, we now analyze Wilson's claim that he was denied his constitutional right to a speedy trial.
[5,6] Ordinarily, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous. State v. Tucker, 259 Neb. 225, 609 N.W.2d 306 (2000). The constitutional right to a speedy trial is guaranteed by U.S. Const. amend. IV and Neb. Const. art. I, § 11; the constitutional right to a speedy trial and the statutory implementation of that right exist independently of each other. State v. Feldhacker, 267 Neb. 145, 672 N.W.2d 627 (2004); State v. Robinson, 12 Neb. App. 897, 687 N.W.2d 15 (2004). In determining whether a defendant's constitutional right to a speedy trial has been violated, the court applies a balancing test in which it approaches each case on an ad hoc basis. See State v. Feldhacker, supra. In Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the U.S. Supreme Court established the following four factors for a balancing test for determination of whether the constitutional right to a speedy trial has been violated: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. None of these four factors standing alone is a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial; rather, the factors are related and must be considered together with such other circumstances as may be relevant. Id. See, also, State v. Feldhacker, supra. We analyze each factor as it relates to the circumstances of this case.

(a) Length of Delay
The record in this case reveals that, although there was only an approximately 6-month delay from the time the State filed the information in district court on July 19, 2005, and the time Wilson filed his motion for discharge on January 20, 2006, there was a 7-year delay from the time the State filed its initial complaint in county court on February 12, 1999, and the time Wilson filed the motion to discharge. The Nebraska Supreme Court has previously held that it would consider unreasonable delays occurring in the prosecution of felony offenses prior to the return of an indictment or filing of an information in determining whether the defendant was denied the constitutional right to a speedy trial. See State v. Born, 190 Neb. 767, 212 N.W.2d 581 (1973).
When we consider the delay prior to the State's filing of the information in district court, we determine that the time between the filing of the initial complaint and the time of filing the information in district court was approximately 6'A years. This is certainly a lengthy delay. The length of the delay in this case favors Wilson.

(b) Reason for Delay
In reviewing the record, it is clear that the delay in this case generally stemmed from the State's inability to locate Wilson. The county court issued a warrant for Wilson's arrest on February 12, 1999, the same day that the State filed its complaint. However, Wilson's first appearance in county court on this matter was not until June 9, 2005.
At the hearing on Wilson's motion for discharge, the State informed the court that law enforcement officials had completed a "diligent search" for Wilson, but were unable to locate him. Specifically, the State informed the court as follows:
[A]t the time the warrant was drafted, there was information given to [officers] by the second individual in this case that [Wilson] may have left for California. Officers at that time did check with the jurisdiction in California to no avail and did not locate [Wilson]. [Wilson] was then located on June 7th of 2005, actually, in the Omaha area, and was actually arrested on charges not related to this matter. And at that time, officers found the warrant from 1998. . . .
Additionally, the State informed the court that the warrant for Wilson's arrest remained in effect until he was arrested in June 2005.
Wilson did not present any evidence to establish his whereabouts from the time the warrant for his arrest was issued in 1998 to the time he was arrested on an unrelated matter in 2005. Wilson also did not present any evidence to rebut the State's statements about its diligent efforts to locate him after the warrant was issued. Because Wilson did not rebut the State's evidence of diligent efforts, we find this factor favors the State.

(c) Assertion of Right
[7] There is some responsibility upon a defendant to assert his right to a speedy trial, but this is not to say that a defendant has a duty to bring himself to trial or to demand a trial. See, Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); State v. Schmader, 13 Neb. App. 321, 691 N.W.2d 559 (2005). The only action which Wilson took that could be seen as an assertion of his right to a speedy trial was to file his motion for discharge on January 20, 2006, 6 months after the State filed the initial information in district court and only 10 days prior to trial. See Doggett v. United States, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) (filing of motion to dismiss may be assertion of rights). In Barker v. Wingo, the Court stated: "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532. Therefore, we find that this factor weighs in favor of the State.

(d) Prejudice to Defendant
[8] Prejudice should be looked at with particularity and should be assessed in the light of the three interests of defendants which the speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern of the accused, and (3) to limit the possibility that the defense will be impaired. See Barker v. Wingo, supra.
There is no evidence in the record to show that Wilson was incarcerated while awaiting trial. Even if there was evidence regarding Wilson's pretrial incarceration, the record indicates that Wilson was not arrested until June 2005 and that he filed his motion for discharge in January 2006. At most then, Wilson spent 6 months in jail prior to filing the motion for discharge. While we recognize both the societal and legal disadvantages of pretrial incarceration, we note that a pretrial incarceration period of 6 months, without further evidence of prejudice, is not inherently oppressive.
There is also no evidence in the record to demonstrate Wilson's level of anxiety or concern during the pendency of these proceedings. While there may be some degree of anxiety and concern in every criminal case, anxiety or concern by itself does not establish prejudice where the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances. State v. Schmader, supra.
There is evidence in the record which demonstrates that at least one of Wilson's witnesses struggled to remember specific details as a result of the time that had passed since the day of the robbery. Wilson called his mother to testify that he was in California with her on the day of the robbery. While Wilson's mother did testify that Wilson was living with her in February 1998 when the robbery occurred, she admitted on cross-examination that she was only sure that Wilson lived with her in December 1997, January 1998, and part of February 1998. She testified that she was not sure what day Wilson left California in February 1998.
The record also reveals that many of the State's witnesses struggled to remember the details of the robbery and the resulting investigation by law enforcement officials. In Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the U.S. Supreme Court noted that just as the defense's case may suffer from a delay in the proceedings, the State's case is often plagued by problems caused by a delay. The Court stated: "As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." 407 U.S. at 521. While Wilson may have been prejudiced by his own witness' memory loss, he also benefited from the memory loss of the State's witnesses. As a result, the prejudice factor does not readily weigh in favor of the defendant or the State. However, given that Wilson's defense was, in fact, impaired to some degree by the delay, we determine that the prejudice factor weighs in his favor.
Wilson argues he was also prejudiced by the delay because the jury could have speculated that he was a "fugitive from justice" or that his failure to appear in court was a result of his "consciousness of guilt." There is no evidence in the record to support these assertions. Without any concrete evidence of the jurors' speculation regarding the delay, we do not consider these facts as a part of our balancing test.

(e) Resolution
As noted above, the factors for assessing the deprivation of an accused's constitutional speedy trial right must be considered on an ad hoc basis, together with other circumstances as may be relevant. After considering the factors in the present case, we conclude that the district court was not clearly erroneous in finding that Wilson's constitutional speedy trial right was not violated. Although the delay was significant, the record before us does not indicate that there was any intentional act by the State to deprive Wilson of his right to a speedy trial. In fact, the record shows that Wilson was brought to trial approximately 6 months after he was finally located in June 2005. In addition, while there is evidence that Wilson's alibi witness had some trouble remembering the exact dates Wilson was present with her in California, there is also evidence that the State's witnesses suffered from memory problems as well. As such, we conclude that this assigned error is without merit, and the district court's order is affirmed.

4. EXCESSIVE SENTENCES
In his last assignment of error, Wilson asserts that the trial court abused its discretion by imposing excessive sentences. We disagree. We find that the sentences imposed by the district court were not excessive. However, we find plain error in the court's sentences to the extent that the court ordered the sentences for the false imprisonment convictions to run concurrently with the sentences for the use of a deadly weapon convictions. We therefore vacate those sentences and remand the cause to the district court with directions to resentence Wilson so that the sentences for the false imprisonment convictions run consecutively to the sentences for use of a deadly weapon.
[9] Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. State v. Walker, 272 Neb. 725, 724 N.W.2d 552 (2006). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. Id. When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. State v. Thurman, 273 Neb. 518, 730 N.W.2d 805 (2007).
Wilson was convicted of two counts of robbery, two counts of use of a deadly weapon to commit a felony, and two counts of false imprisonment in the first degree. Robbery and use of a deadly weapon to commit a felony are both Class II felonies punishable by a term of imprisonment of 1 to 50 years. False imprisonment in the first degree is a Class IIIA felony punishable by a term of imprisonment of up to 5 years.
After Wilson's trial, the district court determined that Wilson was a habitual criminal within the meaning of Neb. Rev. Stat. § 29-2221 (Cum. Supp. 2006). Because the court determined Wilson to be a habitual criminal, he was subject to a term of imprisonment of 10 to 60 years for each count of robbery, use of a deadly weapon to commit a felony, and false imprisonment in the first degree.
The district court sentenced Wilson to a term of imprisonment of 10 to 20 years for each count of robbery, 10 to 20 years for each count of use of a deadly weapon to commit a felony, and 10 to 10 years for each count of false imprisonment in the first degree. The court ordered the sentences for the robbery and use of a deadly weapon to commit a felony convictions to run consecutively to each other and ordered the sentences for false imprisonment to run concurrently with each other and with the other sentences.
Each of Wilson's sentences is clearly within the statutory limits. We have reviewed the record in its entirety. When we consider Wilson's criminal history and the violent nature of the crimes in this case, we cannot say that Wilson's sentences were an abuse of discretion.
[10] We do, however, find plain error in that part of the court's sentencing order which provides that Wilson's sentences for the false imprisonment convictions are to be served concurrently with the sentences for the robbery and the use of a deadly weapon convictions. An appellate court always reserves the right to note plain error which was not complained of at trial or on appeal. State v. Robinson, 271 Neb. 698, 715 N.W.2d 531 (2006).
[11] Although it is generally within the trial court's discretion to direct that sentences imposed for separate crimes be served concurrently or consecutively, Neb. Rev. Stat. § 28-1205(3) (Reissue 1995) does not permit such discretion in sentencing, because it mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed. See, State v. Thomas, 268 Neb. 570, 685 N.W.2d 69 (2004); State v. Sorenson, 247 Neb. 567, 529 N.W.2d 42 (1995). Because the statute mandates that the sentences imposed for the use of a weapon be consecutive to any other sentence, the district court did not have authority to order that the sentences on the two counts of false imprisonment run concurrently with the sentences on the two counts of use of a deadly weapon.
[12] An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. See State v. Robinson, supra. We, therefore, vacate the sentences imposed for the false imprisonment convictions and remand the cause with directions that the district court resentence Wilson such that the sentences for the false imprisonment convictions run consecutively to the sentences on the use of a deadly weapon convictions.

V. CONCLUSION
We find no merit to Wilson's assertions on appeal. The trial court did not err in its rulings regarding the admissibility of evidence of witnesses' prior identifications or prior inconsistent statements. Wilson was not denied his constitutional right to a speedy trial, and the court did not err in overruling his motion to discharge. Additionally, the court did not err by imposing excessive sentences.
However, upon our review of the record, we find plain error in the trial court's sentences to the extent that the court ordered the sentences for the false imprisonment convictions to run concurrently with the sentences for the use of a deadly weapon convictions. We therefore vacate those sentences and remand the cause to the court with directions to resentence Wilson so that the sentences for the false imprisonment convictions run consecutively to the sentences for use of a deadly weapon.
AFFIRMED IN PART, AND IN PART VACATED AND REMANDED WITH DIRECTIONS FOR RESENTENCING.