without merit under either alternative formulation, his counsel was not ineffective in not asserting it at sentencing or on direct appeal.

## CONCLUSION

To summarize, in my view, the rule announced in *Miller* is procedural and does not apply to Mantich on collateral review. I would find that *Graham* has no application to Mantich's sentence of life imprisonment for first degree felony murder, a homicide, and that Mantich's alternative claim that his sentence was grossly disproportionate to his crime is procedurally barred. Because these claims are without merit, Mantich's trial and appellate counsel was not ineffective in failing to assert them. And because the files and records conclusively show that Mantich's motion for postconviction relief is without merit, the district court did not err in denying the requested relief without conducting an evidentiary hearing. I would affirm the decision of the district court.

Heavican, C.J., joins in this dissent.

———————————

State of Nebraska, appellee, v.
Eric A. Ramirez, appellant.
___ N.W.2d ___

Filed February 7, 2014.    No. S-11-486.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility.
2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
4. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.

5. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

6. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

7. **Appeal and Error.** Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

8. **Trial: Juries: Evidence.** Demonstrative exhibits are defined by the purpose for which they are offered at trial; demonstrative exhibits aid or assist the jury in understanding the evidence or issues in a case.

9. **Trial: Evidence.** Exhibits admitted only for demonstrative purposes do not constitute substantive evidence.

10. **Trial: Evidence: Appeal and Error.** On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial.

11. **Appeal and Error.** An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground.

12. **Evidence: Words and Phrases.** Cumulative evidence means evidence tending to prove the same point of which other evidence has been offered.

13. **Trial: Evidence: Appeal and Error.** The erroneous admission of evidence is not reversible error if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding of the trier of fact.

14. **Criminal Law: Statutes: Sentences.** Where a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise.

15. **Appeal and Error.** An appellate court always reserves the right to note plain error which was not complained of at trial or on appeal.

16. **Sentences: Weapons.** Although it is generally within the trial court's discretion to direct that sentences imposed for separate crimes be served concurrently or consecutively, Neb. Rev. Stat. § 28-1205(3) (Reissue 2008) does not permit such discretion in sentencing, because it mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed and concurrent with no other sentence.

17. **Sentences: Appeal and Error.** An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced.

Appeal from the District Court for Douglas County: John D. Hartigan, Jr., Judge. Convictions affirmed, all sentences vacated, and cause remanded for resentencing.

James Martin Davis, of Davis Law Office, and Mark A. Weber, of Carlson & Burnett, L.L.P., for appellant.

Jon Bruning, Attorney General, James D. Smith, and Carrie A. Thober for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.

## NATURE OF CASE

In this direct appeal, Eric A. Ramirez appeals from his convictions and sentences in the district court for Douglas County of two counts of first degree murder, three counts of use of a deadly weapon to commit a felony, one count of attempted second degree murder, one count of attempted robbery, and one count of criminal conspiracy. The first degree murder convictions are each Class IA felonies. Ramirez was 17 years old at the time of the murders. Ramirez assigns error to certain rulings regarding the admission and withdrawal of evidence. We find no merit to these assignments of error and affirm his convictions. Regarding the sentences imposed for his convictions, we conclude that the two life imprisonment sentences without the possibility of parole imposed for the two convictions of first degree murder, counts I and III, are unconstitutional and, accordingly, we vacate those sentences and remand the cause for resentencing consistent with Neb. Rev. Stat. § 28-105.02 (Supp. 2013). We find plain error in regard to the sentences imposed for the convictions of use of a deadly weapon to commit a felony, counts II, IV, and VII, and we vacate such sentences and remand the cause for resentencing consistent with Neb. Rev. Stat. § 28-1205(3) (Cum. Supp. 2012), such that each sentence imposed for the conviction of use of a deadly weapon runs consecutively to all other sentences and concurrently with no other sentence. We also find plain error in regard to the three sentences imposed for the convictions of count V, attempted second degree murder; count VI, attempted robbery; and count VIII, criminal conspiracy, because, as currently written, each of these three sentences was ordered to

run concurrently with the sentences for the convictions of use of a deadly weapon, and, even after resentencing in counts II, IV, and VII, these three sentences as written would impose sentences which would run concurrently with at least two sentences for the convictions of use of a deadly weapon. We vacate the sentences for counts V, VI, and VIII and remand the cause for resentencing such that the sentences imposed do not run concurrently with the sentences for the convictions of use of a deadly weapon. Accordingly, we affirm the convictions, vacate all of the sentences, and remand the cause for resentencing consistent with this opinion.

## STATEMENT OF FACTS

This case involves three shootings that occurred on the night of November 12, 2008, at three separate locations in Omaha, Nebraska, within an hour of each other. These shootings resulted in the deaths of two people and injury to a third person. Ramirez, Edgar Cervantes, and Juan E. Castaneda were later arrested for the crimes; Cervantes testified against Ramirez and Castaneda pursuant to a plea agreement.

The first shooting took place at a residence located on Dorcas Street, in Omaha, where Luis Silva was shot at approximately 10:45 p.m. outside his residence. Jose Hernandez, Silva's cousin, was living with Silva at the time, along with an aunt and another cousin. Hernandez testified that he was home at approximately 10:30 p.m. when Silva's truck, a Chevrolet Blazer, arrived and parked in the driveway. Hernandez testified that he went outside to ask Silva to come inside and that Silva told Hernandez he was going to finish a telephone call. About 2 minutes later, Hernandez heard the truck's horn honk. Hernandez testified that he looked outside and saw Silva lying on the ground near the truck and a man with a gun standing next to him. Hernandez also saw another man by a tree nearby. The man next to Silva pointed his gun at Hernandez and, speaking in Spanish, said that "they only wanted money." The other man then said, "Let's go," in English. Through his porch window, Hernandez watched the two men leave. Hernandez testified that the man who pointed the gun at him was wearing black pants and a black, hooded sweatshirt and had a

goatee and that the other man was wearing black pants and a gray sweatshirt.

Silva was shot twice. One bullet grazed the left side of his head. The other bullet entered his upper back, and continued to the left side of his chest. Silva was pronounced dead upon his arrival at an Omaha hospital.

The second shooting took place near North 50th Street and Underwood Avenue. Shortly after Silva was shot, Charles Denton and Hilary Nelsen drove to a walkup automatic teller machine (ATM). Denton got out of the van he was driving to use the ATM, while Nelsen remained in the van. Nelsen and Denton saw two people walking toward their vehicle. Nelsen testified that they were male and were wearing their hoods up. Nelsen testified that after Denton started the van, the two men started running toward the van. One of the men approached the driver's-side window and yelled at Nelsen and Denton to give him money. The man fired his gun, and Denton drove away. Denton called the 911 emergency dispatch service, but after he realized that he had been shot, he asked Nelsen to talk to the 911 operator.

Nelsen testified that she believed the men were not white but that she could not tell if they were "Hispanic" or "black." Nelsen and Denton both testified that the gun was silver. Denton stated the men were Hispanic and that the man with the gun had facial hair. Denton testified that the shooter was wearing a lighter-colored, hooded sweatshirt; that the other man was wearing a darker-colored, hooded sweatshirt; and that both men were wearing their hoods up. Denton sustained a bullet wound through his left bicep and a graze on his chest.

The third shooting took place in the parking lot of a gas station at South 52d and Leavenworth Streets. Tari Glinsmann was finishing her shift at the gas station. A passerby noticed a green Ford Taurus in front of the gas station with the lights on, the door open, and the engine running. The passerby saw a body and called 911. Glinsmann was dead when the rescue workers arrived on the scene.

A crime scene technician with a specialty in fingerprint identification was called by the State to testify. The fingerprint specialist testified that she dusted the exterior of the Ford

Taurus, concentrating on areas where it appeared that the dust and dirt on the car had been smudged. She testified that she lifted three latent prints from the car: two on the hood of the car on the passenger side and one from just above the driver's-side door handle. She testified that the prints from the hood of the car appeared to be two parts of a left palmprint. After analysis, the fingerprint specialist determined that the latent prints found on the hood of the car matched Castaneda's prints.

Another of the State's witnesses was Cervantes, who agreed to testify against Ramirez and Castaneda pursuant to a plea agreement. Cervantes testified that on November 12, 2008, he called Ramirez to see "if he wanted to go jack [rob] some people and get some extra money." When Cervantes called Ramirez later, Ramirez said he was at a friend's house near South 24th and L Streets, and Cervantes offered to pick him up. Cervantes testified that he drank some beer and used cocaine while at the friend's house. Ramirez asked Cervantes if Castaneda could come along and if he could give "Tiny," another friend, a ride home. Cervantes agreed.

Cervantes testified that while he was on his way to drop off Tiny at home, Ramirez was in the front passenger seat and Tiny and Castaneda were in the back seat. Cervantes testified that he passed a gun, which was wrapped in a blue bandanna, to Ramirez and that Ramirez put the gun under his seat. Cervantes stated that after he dropped off Tiny, they proceeded to South 13th and Dorcas Streets where they saw "some white guys getting out of [a] truck." Cervantes testified that Ramirez and Castaneda got out of the car and tried to rob them. Ramirez and Castaneda then ran back to the car and said that the men did not have any money and that they "started getting crazy." Cervantes testified that both he and Ramirez were wearing gray, hooded sweatshirts and that Castaneda was wearing a black coat with fur trim and orange lining on the inside.

Cervantes testified that he then drove west on Dorcas Street, when Cervantes saw a man in a Chevrolet Blazer and pointed him out to Ramirez and Castaneda. Once again, Ramirez and Castaneda got out of the car while Cervantes waited. Cervantes heard a gunshot, Ramirez and Castaneda

ran back to the car, and Cervantes drove away. Cervantes testi-
fied that Ramirez told him that when the man started honking
the horn, Ramirez shot him through the vehicle's window.
Castaneda then pulled the man out of the vehicle and began
searching him. The people inside the house tried to come out,
but Ramirez pointed his gun at the house so they would not
come outside. Ramirez and Castaneda then ran back to the car
with the man's wallet.

Cervantes stated that after robbing Silva, he drove to the area
around North 50th Street and Underwood Avenue, where they
saw a man at an ATM. Once again, Ramirez and Castaneda got
out of the car, and Cervantes drove around the block. Cervantes
heard gunshots, and Ramirez and Castaneda ran back to the
car. Cervantes testified that Ramirez told him that the man saw
them coming and started to drive away in his van, so Ramirez
shot at the van.

Cervantes then drove south until they reached South 52d
and Leavenworth Streets. Ramirez and Castaneda then saw
Glinsmann at the gas station and asked Cervantes to stop.
Ramirez and Castaneda, once again, got out of the car and
went over to the gas station. Cervantes parked in a nearby lot,
and he heard a gunshot. Ramirez and Castaneda ran back to
the car and got in. Cervantes testified that Ramirez said he shot
Glinsmann in the head.

At trial, the State also called as a witness Preston Landell,
the operations coordinator for Cricket Communications
(Cricket) in Omaha and Lincoln, Nebraska, to testify regard-
ing the cell phone records of Ramirez and Castaneda. Landell
stated that he is essentially a recordkeeper for Cricket and
that he had testified as a recordkeeper in other cases in the
past. Landell testified that his duties included maintaining
records at Cricket and being a resource for direct and indirect
retail teams.

Landell stated that records of calls made were stored in a
server for 6 months and that the date was recorded immedi-
ately at the time of sending a call. Text messages are stored in
the same way, but on a different server. Records are kept for
6 months after the date of sending the text message. Landell
testified as to the telephone number assigned to Ramirez and

the telephone number assigned to Castaneda's stepmother. The records show the cell phone number from which the call or text originated and the recipient's number, the time and duration of the call, and the cell tower used to process the call or text. The State offered the cell phone and text records for each of these accounts for the dates of November 9 to 19, 2008. The records were received without objection.

The State also showed Landell exhibit 224, which is a timeline summarizing the calls and texts between the cell phones of Ramirez, Castaneda, and a third telephone number from November 9 to 19, 2008. The information reflected on the timeline was extracted from cell phone account records already in evidence. Although exhibit 224 was discussed, it was not offered or received into evidence at this point in the trial.

Landell further testified regarding the operation of cell towers. He stated that as an operational employee, he had a "working knowledge of the infrastructure of the cell phone towers." Landell stated that when a call is made, the caller's cell phone searches for the closest available tower to route the call to a "switch." When the call reaches the switch, certain information is recorded in the server, including the date, time, and duration of the call; the caller's telephone number; the destination telephone number; the number of the cell tower that was used; and any special features that were used during the call. The switch then searches for the cell tower closest to the destination cell phone and uses that cell tower to route the call to the destination telephone. Landell testified that these records are kept and stored in the ordinary course of business, at or near the time the calls are made.

When the State asked Landell whether a cell phone would use the closest cell tower when sending or receiving a call, Ramirez objected on the basis of foundation. The objection was overruled, and Landell testified that that was generally how the system works, but not always. When asked whether there was a distance that a tower would pull a call from, Landell testified—over Ramirez' foundation objection—that a rural cell tower may have a 20-mile radius while the radius in an urban setting is much less because of obstructions and more tower traffic.

The State then offered exhibit 259, which is a map of a portion of Omaha showing the locations of the six cell towers that were used by Ramirez' cell phone the night of the shootings, along with the locations of the shootings. The map shown on exhibit 259 incorporated information from evidence that was previously admitted during trial with the exception of the exact street addresses of the cell towers. Landell stated that he had reviewed exhibit 259 and that the addresses and locations of the cell towers shown on the exhibit were correct. Ramirez objected to exhibit 259 based on foundation and was granted permission to voir dire Landell. During voir dire, Landell stated that generally, a cell phone call will go to the closest tower if it is available, but that he could not say with certainty that a call will always go to the closest tower. Landell further stated that if the towers are busy, a call may go to a number of towers before it is put through. The court overruled Ramirez' foundation objection and received exhibit 259 into evidence.

There is a suggestion in the record that the parties agreed to a stipulation of facts to the effect that Ramirez lived with his mother, that he was on probation, and that Ramirez' mother tried to ensure that he was home by curfew every night, but that she could not guarantee Ramirez never would have snuck out of the house after curfew. After the State rested, the defense did not call any witnesses or offer evidence.

Before closing arguments were made, the trial judge summoned counsel outside the presence of the jury to discuss exhibit 259, which was the map which showed the locations of the shootings and cell towers used by Ramirez' cell phone the night of the shootings. After further discussion, the judge withdrew exhibit 259, which had been admitted over Ramirez' foundational objection. The trial judge later orally admonished the jury by saying: "One final item on the evidence. Exhibit 259 has been withdrawn from evidence. You are instructed not to consider it in your deliberations or the testimony of . . . Landell regarding the location of cell towers insofar as the subscriber's location is concerned." Ramirez moved for a mistrial, which the court overruled. For completeness, we note that the

written jury instructions stated that the jury "must disregard all evidence ordered stricken."

The morning after jury deliberations began, it was noticed that exhibit 224, the timeline of the cell phone calls and texts which had been made between the cell phones of Ramirez, Castaneda, and a third subscriber, had not been offered or received into evidence. Exhibit 224 incorporated information from previously admitted evidence, primarily Ramirez' and Cervantes' cell phone records. After hearing arguments from both parties outside the presence of the jury, the court allowed the State to supplement the record and received exhibit 224 at that time. The district court judge commented that exhibit 224

> doesn't contain any information that hasn't been received into evidence, and it had been referenced [sic] to during the evidence and closing arguments. . . . It's a fair representation of a timeline that is already in evidence through those records. And so the exhibit will be included among the evidence that the court reporter transmits to the jury for [its] deliberation.

Ramirez moved for a mistrial, and the court overruled the motion.

The jury found Ramirez guilty on all eight counts. Ramirez filed a motion for new trial on various bases, including the admission and later withdrawal of exhibit 259, the map, and the admission of exhibit 224, the timeline of cell phone calls and texts. The district court denied Ramirez' motion for new trial.

In ruling on the motion for new trial, the court determined that the admission and later withdrawal of exhibit 259 did not require a new trial. The court explained: "I withdrew [exhibit] 259 from evidence, really, in an abundance of caution because I didn't want someone to draw the inference that the subscriber or user was in a particular location at a particular time and that that was the significance of [exhibit] 259." In further explaining why the court withdrew exhibit 259, the district court judge stated:

> It was a belt-and-suspenders approach, really. I don't think he [Landell] ever claimed in his testimony or the

exhibit ever stated that the subscriber or the user was in a particular location at a given time. He just talked about the program; the way, depending upon traffic, cell towers are programmed to receive and transmit incoming and outgoing calls.

In denying Ramirez' motion for new trial, the district court also stated that the admission of exhibit 224, the timeline of cell phone calls and texts, did not require a new trial. The court stated that exhibit

224 was not itself an item of evidence but a summary of other evidence that had been received and it was referred to during the trial for the jury's benefit by counsel at different times, and I did not want to hobble the jury in [its] consideration of the evidence by taking an item away from [its] consideration that everybody had used, and [exhibit 224] was itself not substantive evidence but a compilation of other items that had been separately received.

Following denial of the motion for new trial, the court conducted the sentencing hearing on December 29, 2010. The December 30, written sentencing order stated that Ramirez had been informed of his convictions for the following eight crimes:

| Count I | Murder in the First Degree . . . . |
|---------|-----------------------------------|
| Count II | Use of a Deadly Weapon to Commit a Felony . . . . |
| Count III | Murder in the First Degree . . . . |
| Count IV | Use of a Deadly Weapon to Commit a Felony . . . . |
| Count V | Attempted Murder in the Second Degree . . . . |
| Count VI | Attempted Robbery . . . . |
| Count VII | Use of a Deadly Weapon to Commit a Felony . . . . |
| Count III | Criminal Conspiracy . . . . |

We note that counts I and III, murder in the first degree, are Class IA felonies. See Neb. Rev. Stat. § 28-303 (Reissue 2008). We further note that counts II, IV, and VII involve use of a deadly weapon to commit a felony.

The sentencing order set forth Ramirez' sentences as follows:

| Count I | Life imprisonment without the possibility of parole |
|---------|------------------------------------------------------|
| Count II | 12 - 15 years consecutive to Count I only |
| Count III | Life imprisonment without the possibility of parole |
| Count IV | 12 - 15 years consecutive to Count III only |
| Count V | 12 - 20 years concurrent with all |
| Count VI | 12 - 15 years concurrent with all but Count VII |
| Count VII | 12 - 15 years consecutive to Count VI only |
| Count VIII | 12 - 15 years concurrent with all |

In its sentencing order, the district court ordered that each of the sentences for the convictions of use of a deadly weapon were to run consecutively only to the sentence for the underlying felony conviction.

On April 13, 2011, we dismissed Ramirez' first appeal in case No. S-11-090, based on Ramirez' failure to submit a docket fee or file a poverty affidavit. Ramirez then filed a motion to vacate judgment of conviction in the district court for Douglas County, which the district court granted, limiting relief to a new direct appeal of the original convictions and sentences. This is the direct appeal before us.

While this appeal was pending, the U.S. Supreme Court decided *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 2469, 183 L. Ed. 2d 407 (2012), holding that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Ramirez was born in September 1991, which made him 17 years old at the time of the crimes. On July 11, 2012, we filed an order directing supplemental briefing, instructing the parties to address issues raised by *Miller v. Alabama*, *supra*.

After this court heard oral argument, the Nebraska Legislature passed, and the Governor signed, 2013 Neb. Laws, L.B. 44, which amended state law to "change penalty provisions with respect to Class IA felonies committed by persons under eighteen years of age [and] to change parole procedures with respect to offenses committed by persons under eighteen years of age." On September 12, 2013, we filed an

order directing supplemental briefing, instructing the parties to address whether the provisions of L.B. 44 apply to Ramirez if the cause is remanded for resentencing.

## ASSIGNMENTS OF ERROR

Ramirez claims, summarized and restated, that the district court erred when it (1) denied his motion for new trial based on the denial of his motion for mistrial resulting from the admission and later withdrawal of exhibit 259, the map, and testimony relative thereto, and (2) denied his motion for new trial based on the denial of his motion for mistrial resulting from the admission of exhibit 224, the timeline of cell phone calls and texts, after the parties had rested.

In his first supplemental brief, Ramirez assigns additional errors, rephrased, that (3) the two life sentences imposed on him violated the Eighth Amendment's ban on cruel and unusual punishment by imposing lifetime sentences without first requiring a sentencing hearing and without any meaningful opportunity for the juvenile to obtain release based on demonstrated maturity and rehabilitation, and (4) the district court erred by sentencing Ramirez to two terms of life imprisonment without the possibility of parole, because the sentences are not authorized under existing Nebraska statutes and the sentences are void as unconstitutional under *Miller v. Alabama*, supra.

## STANDARDS OF REVIEW

[1-3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Merchant*, 285 Neb. 456, 827 N.W.2d 473 (2013). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

[4] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *State v. Richardson*, 285 Neb. 847, 830 N.W.2d 183 (2013).

[5] Whether to grant a mistrial is within the trial court's discretion, and we will not disturb its ruling unless the court abused its discretion. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

[6] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2012).

[7] Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

## ANALYSIS

*Exhibit 259 and Related Testimony.*

Ramirez contends that it was error to admit certain of Landell's testimony and exhibit 259, a map of a portion of Omaha showing the location of the shootings, the residences of various persons, and the locations of cell towers that were used by Ramirez' cell phone on the night of the shootings. Ramirez contends there was insufficient foundation for the evidence. Ramirez further asserts that the district court's later withdrawal of the exhibit, its striking of the testimony, and its admonition to the jury were insufficient to cure this error. Ramirez thus claims that the district court erred when it overruled his motion for mistrial and denied his motion for new trial on the same basis.

In a criminal case, we review the denial of a motion for new trial for abuse of discretion. See *State v. Williams, supra*. As explained below, exhibit 259 was merely demonstrative, and Landell provided sufficient foundation for the information on exhibit 259. We therefore determine that neither the

proceedings surrounding exhibit 259 nor the denial of the motion for mistrial based on the rulings surrounding exhibit 259 was an abuse of discretion and that therefore, a new trial was not warranted. We find no merit to Ramirez' argument.

[8] With respect to the nature of exhibit 259, we first note that exhibit 259 was admissible at trial as a demonstrative exhibit. Demonstrative exhibits are defined by the purpose for which they are offered at trial; demonstrative exhibits aid or assist the jury in understanding the evidence or issues in a case. *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013). See, also, 2 McCormick on Evidence § 214 (Kenneth S. Broun et al. eds., 7th ed. 2013). Demonstrative exhibits "are relevant . . . only because of the assistance they give to the trier in understanding other real, testimonial and documentary evidence." *Id*. at 19.

Exhibit 259 reflected numerous undisputed facts already in evidence, including the location of the shootings, the residences of various persons, and the location of the cell towers used during the timeframe of the shootings. Ramirez does not take issue with the depiction of this evidence on the map. Overall, exhibit 259 was demonstrative.

Ramirez concedes that his cell phone records and Landell's related testimony explaining how to interpret the information shown in the cell phone records were properly admitted into evidence. These records indicated which cell towers were used by Ramirez' cell phone on the night of the shootings. The information on the map shown on exhibit 259 was derived from properly admitted evidence; with the exception of the exact street addresses for cell towers, exhibit 259 was a demonstrative exhibit that was used to aid the jury in understanding the facts already in evidence. Because exhibit 259 was demonstrative, it was not error for the district court to admit it or to publish it to the jury during trial.

[9] Although withdrawal was not necessary, we do not find an abuse of discretion to the district court's subsequent withdrawal of exhibit 259. We have stated that due to the difference in purpose, an exhibit admitted for demonstrative purposes—that is, to aid the jury—is not evidence in the same way that an exhibit admitted for substantive purposes—that

is, as proof of an underlying fact or occurrence—is evidence. *State v. Pangborn, supra*. In *Pangborn*, we agreed with the majority of appellate courts and the major evidence treatises and held that exhibits admitted only for demonstrative purposes do not constitute substantive evidence. *Id*. (citing cases). Exhibit 259 aided the jury while it was available during trial. For the district court to withdraw exhibit 259, which was not substantive, was not an abuse of discretion. The jury was not disadvantaged, nor was Ramirez harmed when exhibit 259, which was nonsubstantive evidence, was not ultimately admitted.

[10,11] With respect to the foundation for exhibit 259, we note that when the State offered exhibit 259 at trial, Ramirez objected to the exhibit only on the basis of foundation. On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). Accordingly, our analysis is limited to Ramirez' claim that the district court initially erroneously admitted exhibit 259 and Landell's related testimony based on insufficient foundation.

Under Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 2008), a lay witness will not be permitted to testify as to objective facts in the absence of foundational evidence establishing personal knowledge of such facts. See *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998). Evidence rule 602, regarding laying the foundation of personal knowledge, provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of section 27-703, relating to opinion testimony by expert witnesses.

Pertinent to our analysis in the present case is our decision in *State v. Robinson, supra*. In *Robinson*, prior to trial, the defendant made a motion in limine with respect to the defendant's cell phone records. The defendant complained that the State had gathered data regarding the locations of the towers through which the defendant had placed telephone calls, and he contended that the location data were not scientifically reliable. The trial court overruled the motion in limine, pending the State's presentation at trial of proper and sufficient foundation for the evidence.

At trial in *Robinson*, two witnesses who worked for the communications company, Cricket, testified. One was a "'switch tech,'" who worked on the central computer system that interacted with the cellular sites, and the other was a field engineer, who was responsible for maintaining and optimizing the network of cellular sites throughout the city of Omaha. *Id*. at 611, 724 N.W.2d at 63. During the switch tech's testimony, the State offered the cell phone records. The defendant objected to the records on the bases of foundation, hearsay, and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The objections were overruled, and the exhibits were received.

We concluded in *Robinson* that the cell phone records offered by the State fell within the business records exception to the rule against hearsay. We then determined that a *Daubert* challenge was not pertinent to the cell phone records, because they "contained nothing even resembling 'expert opinion testimony.'" *State v. Robinson*, 272 Neb. at 619, 724 N.W.2d at 69. We further determined that *Daubert* remained inapplicable even if the defendant's objections and argument were construed to address the field engineer's testimony relating to the cell phone records, because the field engineer's testimony was limited to explaining the data contained in the cell phone records, and he did not offer any opinions based on that data. We stated that "[t]o the extent that the defendant wanted to raise more general questions about the reliability of the records and the cellular location data, [the field engineer] was available for cross-examination on those issues." *State v. Robinson*, 272 Neb. at 620, 724 N.W.2d at 69. Based on our determinations

that the cell phone records fell within the business records exception and that given the purpose for which the records were offered no *Daubert* hearing was required with respect to the records, we determined that the trial court did not err when it admitted the cell phone records into evidence.

After deciding *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), we decided *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011), which also involved the admission of cell phone records into evidence. In *Taylor*, the defendant claimed that cell phone records were erroneously admitted into evidence due to a lack of foundation. The defendant based his foundational argument on the requirement of authentication provided by Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008). In *Taylor*, the cell phone records at issue were authenticated by the same Cricket employee, Landell, who testified in the present case. We rejected the defendant's argument and determined that Landell's testimony was sufficient to authenticate the cell phone records.

In the present case, the cell phone records indicated which cell towers were used by Ramirez' cell phone on the night of the shootings, and Ramirez concedes that the cell phone records and Landell's related testimony explaining how to interpret the information shown in the records were properly admitted into evidence. At trial, Ramirez objected to exhibit 259 only on the basis of foundation. He does not argue that exhibit 259 or Landell's related testimony was inadmissible as expert testimony under Neb. Evid. R. 703, Neb. Rev. Stat. § 27-703 (Reissue 2008), or that the evidence was subject to a *Daubert* hearing. Instead, Ramirez contends that there was an insufficient basis that Landell had personal knowledge regarding the routing of cell phone calls among cell towers and the locations of subscribers in relation to those towers. We believe that Ramirez misconstrues the record and the nature of Landell's testimony. We therefore disagree with Ramirez' argument that there was insufficient foundation for exhibit 259 and Landell's related testimony.

At trial, Landell testified that as an operational employee, he was required "to have a working knowledge of the infrastructure of the cell phone towers." He also testified that he

had many discussions with the network operation technicians or engineers at Cricket regarding cell tower locations and how the infrastructure is used. Landell also testified how, as a general matter, cell phone calls are routed through the network.

Landell testified that when a call is made, generally, the caller's cell phone searches for the closest available tower to route the call to the switch. The switch then typically searches for the closest available tower to the destination cell phone, and it uses that tower to route the call to the destination cell phone. Landell testified that the closest tower to the caller's cell phone or the destination cell phone will not always be used because of too much traffic or some other obstruction. With respect to exhibit 259, Landell testified that he had reviewed the exhibit and that the addresses and the locations of the cell towers shown on the map were accurate.

Based on Landell's testimony, we determine that he provided sufficient foundational evidence to demonstrate that he had personal knowledge generally regarding how cell phone calls are routed through the network, which cell towers were used by Ramirez' cell phone on the night of the shootings, and that the location on the map of the cell towers used that night were accurate. Furthermore, Ramirez cross-examined Landell regarding the foregoing issues, and he was permitted to question Landell when the State offered exhibit 259. As an operational employee of Cricket, Landell was able to verify the addresses and locations of the cell towers depicted on the exhibit 259 map. It is significant, and we note, that Landell did not offer an opinion regarding cell tower locations and their relation to Ramirez' location. Based upon his testimony at trial, we determine that there was sufficient foundational evidence to demonstrate Landell's personal knowledge under rule 602, and thus the admission of exhibit 259 was not objectionable on this basis.

We are aware that there is currently a discussion among the courts regarding the reliability and the admissibility of cell tower location data and their relation to a defendant's location. See, e.g., *U.S. v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). See, also, Aaron Blank, *The Limitations and Admissibility of*

*Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 Rich. J.L. & Tech. 3 (2011). We are also aware that there are emerging legislation and discussions regarding the necessity of a search warrant to obtain tracking information from cell phone providers. See, e.g., Mont. Code Ann. § 46-5-110 (2013); *State v. Earls*, 214 N.J. 564, 70 A.3d 630 (2013). However, at the trial of the present case, Ramirez did not claim that exhibit 259 was inadmissible on these bases. Ramirez objected only on the basis of foundation, and, as stated above, we have determined that sufficient foundation was laid for the admission of exhibit 259 and Landell's related testimony.

Based on our determination that sufficient foundation was laid and based on the fact that exhibit 259 was a demonstrative exhibit, we determine that the district court did not abuse its discretion when it admitted exhibit 259 and Landell's related testimony into evidence. Although it was not necessary, the district court did not err when it later withdrew exhibit 259 and admonished the jury regarding exhibit 259. The district court did not abuse its discretion when it denied Ramirez' motion for mistrial based on exhibit 259, and thus it did not err when it later denied his motion for new trial on the same basis.

*Exhibit 224.*

Ramirez contends that it was error to admit exhibit 224, a timeline summarizing the calls and texts between the cell phones used by Ramirez, Castaneda, and a third telephone number. As recited in our "Statement of Facts," exhibit 224 was received after the close of evidence. Ramirez contends that the district court erred when it denied his motion for mistrial based on admission of exhibit 224 and thus it erred when it denied his motion for new trial urged on the same basis. Because we determine that the district court did not abuse its discretion when it admitted exhibit 224, we determine that the court did not err when it denied Ramirez' motion for mistrial on the basis of admitting exhibit 224 and did not err when it denied his motion for new trial on this basis. Thus, we find no merit to this assignment of error.

Ramirez concedes that exhibit 224 was referred to during trial and that its contents were derived from documents admitted in evidence. He nevertheless contends that it was not properly offered or received. He states that after the jury began its deliberations, the State could have reopened its case to offer exhibit 224. Ramirez contends that because exhibit 224 was not offered during the evidentiary portion of the trial and because there was no motion to reopen the evidence, the district court did not adhere to the proper formalities for receipt of evidence and that a mistrial should have been declared.

In the present case, after closing arguments were given and after jury instructions were read, the case was given to the jury on October 20, 2010, at 4:18 p.m. for deliberations. The next day at approximately 9 a.m., during what might fairly be characterized as "housekeeping," the district court judge noticed that exhibit 224 had not been received into evidence and brought this to the attention of counsel. After arguments by both parties, the judge stated outside the hearing of the jury that exhibit 224

> doesn't contain any information that hasn't been received into evidence, and it had been referenced [sic] to during the evidence and closing arguments. I think that it would hobble the jury to take that away from [it]. It's a fair representation of a timeline that is already in evidence through those records.

Based upon this reasoning, the court stated that exhibit 224 would "be included among the evidence that the court reporter transmits to the jury for [its] deliberation." Ramirez moved for a mistrial, which was overruled. He later unsuccessfully moved for a new trial on this same basis.

[12,13] Exhibit 224 was a demonstrative exhibit. As we have recently explained, demonstrative exhibits are exhibits offered at trial to aid or assist the jury in understanding the evidence or issues in a case. See *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013). See, also, 2 McCormick on Evidence § 214 (Kenneth S. Broun et al. eds., 7th ed. 2013). The information contained in exhibit 224 was a synthesis of information taken from other lengthy exhibits that were properly received into evidence during trial without

objection. Furthermore, because exhibit 224 contained facts already received in evidence, it was cumulative. Cumulative evidence means evidence tending to prove the same point of which other evidence has been offered. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). The erroneous admission of evidence is not reversible error if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding of the trier of fact. See *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006). In fact, at the hearing on Ramirez' motion for new trial, Ramirez' attorney stated that exhibit 224 "was merely a summary of telephone records that were already in evidence that, I would concede, would have been considered cumulative in nature."

Based on the fact that exhibit 224 was a demonstrative exhibit and that it was cumulative of other properly admitted evidence, we cannot say that the district court abused its discretion when it admitted exhibit 224 into evidence. We acknowledge that the formality of reopening the record was not observed, but as we read the record quoted above, exhibit 224 was added to the evidence at a time previous to when the court reporter might later transmit evidence to the jury. We cannot find that the procedure employed was prejudicial. Accordingly, we determine that the district court did not err when it denied Ramirez' motion for mistrial and, thus, it did not err when it denied his motion for new trial with respect to the admission of exhibit 224.

*Ramirez' Sentences.*

Ramirez claims that the district court erred when it sentenced him to life imprisonment without the possibility of parole for counts I and III. After Ramirez filed his notice of appeal but before the case was argued before us, the U.S. Supreme Court decided *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). *Miller* generally held that it is unconstitutional to sentence a juvenile convicted of a homicide to a mandatory sentence of life imprisonment without the possibility of parole.

This court filed an order directing supplemental briefing, instructing the parties to address the issues raised by *Miller*. In

its supplemental brief, the State argued that Ramirez' sentences were unaffected by *Miller* because they were not sentences without the possibility of parole. The State suggested that the district court improperly sentenced Ramirez to "[l]ife imprisonment without the possibility of parole" and that instead, under Nebraska law, the court should have simply sentenced Ramirez to "'life imprisonment.'" Supplemental brief for appellee at 2. With the deletion of the phrase "without the possibility of parole," the State contends that Ramirez' sentences were not sentences without the possibility of parole, because upon commutation to a term of years, parole would be available to Ramirez. The State further argued that if *Miller* did apply, Ramirez' current life sentences should be vacated and the cause remanded for resentencing in light of the sentencing factors which are discussed in *Miller* and which are now reflected in § 28-105.02.

Similar to the State, Ramirez argued in his supplemental briefing that the district court improperly added the phrase "without the possibility of parole" to his sentences of life imprisonment. Supplemental brief for appellant at 21. Of greater relevance, however, Ramirez argued that *Miller* is applicable to this case and that in light of *Miller*, Ramirez' life sentences were unconstitutional and his sentences should therefore be vacated and he should be resentenced in accordance with § 28-105.02.

We recently addressed similar arguments regarding *Miller* and its application in *State v. Castaneda, ante* p. 289, ___ N.W.2d ___ (2014), which, like the current case, was before us on direct appeal. In *Castaneda*, the defendant, a juvenile at the time of his crimes, was convicted of two first degree murders and was sentenced to two terms of life imprisonment without the possibility of parole. In *Castaneda*, we noted that at the time the defendant was sentenced, Nebraska's statutes provided that a juvenile convicted of first degree murder was subject to mandatory life imprisonment, and although the statutes did not expressly contain the qualifier "without parole," we found that "Nebraska's sentence of life imprisonment is effectively life imprisonment without parole under the rationale of

*Miller* . . . because it provides no meaningful opportunity to obtain release." *Ante* at 313-14, ___ N.W.2d at ___. We further determined that because *Castaneda* was before us on direct appeal, *Miller* was applicable. The instant case is also before us on direct appeal, and we determine, as we did in *Castaneda*, that *Miller* is applicable.

After we heard oral argument on Ramirez' appeal, in reaction to *Miller*, the Nebraska Legislature passed, and the Governor signed, L.B. 44, which amended state law to "change penalty provisions with respect to Class IA felonies committed by persons under eighteen years of age [and] to change parole procedures with respect to offenses committed by persons under eighteen years of age."

Section 28-105.02 provides:

> (1) Notwithstanding any other provision of law, the penalty for any person convicted of a Class IA felony for an offense committed when such person was under the age of eighteen years shall be a maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment.
>
> (2) In determining the sentence of a convicted person under subsection (1) of this section, the court shall consider mitigating factors which led to the commission of the offense. The convicted person may submit mitigating factors to the court, including, but not limited to:
>
> (a) The convicted person's age at the time of the offense;
>
> (b) The impetuosity of the convicted person;
>
> (c) The convicted person's family and community environment;
>
> (d) The convicted person's ability to appreciate the risks and consequences of the conduct;
>
> (e) The convicted person's intellectual capacity; and
>
> (f) The outcome of a comprehensive mental health evaluation of the convicted person conducted by an adolescent mental health professional licensed in this state. The evaluation shall include, but not be limited to, interviews with the convicted person's family in order

to learn about the convicted person's prenatal history, developmental history, medical history, substance abuse treatment history, if any, social history, and psychological history.

And Neb. Rev. Stat. § 83-1,110.04 (Supp. 2013) further provides:

(1) Any offender who was under the age of eighteen years when he or she committed the offense for which he or she was convicted and incarcerated shall, if the offender is denied parole, be considered for release on parole by the Board of Parole every year after the denial.

(2) During each hearing before the Board of Parole for the offender, the board shall consider and review, at a minimum:

(a) The offender's educational and court documents;

(b) The offender's participation in available rehabilitative and educational programs while incarcerated;

(c) The offender's age at the time of the offense;

(d) The offender's level of maturity;

(e) The offender's ability to appreciate the risks and consequences of his or her conduct;

(f) The offender's intellectual capacity;

(g) The offender's level of participation in the offense;

(h) The offender's efforts toward rehabilitation; and

(i) Any other mitigating factor or circumstance submitted by the offender.

At the time of Ramirez' sentencing for first degree murder, the district court was required to impose a sentence of life imprisonment. See Neb. Rev. Stat. § 28-105(1) (Reissue 2008). As we explained above, a sentence imposed under § 28-105(1) was tantamount to life imprisonment without the possibility of parole and, under *Miller*, such sentence was unconstitutional. Ramirez' life sentences for counts I and III imposed under § 28-105(1) as it then existed must be vacated, and Ramirez must be resentenced.

In view of the enactment of L.B. 44, this court sought supplemental briefing regarding the issue of whether Ramirez should be resentenced under the provisions of L.B. 44. Both

the State and Ramirez contend that L.B. 44 should be utilized if this cause is remanded for resentencing.

[14] This court recently discussed the applicability on direct appeal of L.B. 44 in *State v. Castaneda, ante* p. 289, ___ N.W.2d ___ (2014). We stated in *Castaneda* that

> the change effected by L.B. 44 does not violate ex post facto principles.
>
> Nor is it inconsistent under Nebraska law for this mitigation in sentencing to apply upon resentencing. "[W]here a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise." And in this case, the Legislature has not provided otherwise.

*Ante* at 319, ___ N.W.2d at ___. In light of the foregoing discussion, we determine that L.B. 44 applies to Ramirez' resentencing upon remand. We therefore vacate Ramirez' life sentences imposed for counts I and III and remand the cause for resentencing under the procedures set forth under L.B. 44.

[15] In addition to the corrections needed regarding the sentences for murder, we also note that upon our review of the record, we find plain error in the district court's sentencing order regarding the sentences for use of a deadly weapon to commit a felony, counts II, IV, and VII, and regarding the sentences for attempted second degree murder, count V; attempted robbery, count VI; and criminal conspiracy, count VIII. An appellate court always reserves the right to note plain error which was not complained of at trial or on appeal. *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012). Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). As explained below, each sentence for use of a deadly weapon, counts II, IV, and VII, should have been

ordered to run consecutively to all other sentences imposed and not concurrently with any sentence, and the sentences for attempted second degree murder, attempted robbery, and criminal conspiracy, counts V, VI, and VIII, respectively, should not have been ordered to be served concurrently with any use of a deadly weapon sentence.

In its December 30, 2010, order, the district court stated that Ramirez had been informed of his convictions for the following crimes:

| Count I | Murder in the First Degree . . . . |
| Count II | Use of a Deadly Weapon to Commit a Felony . . . . |
| Count III | Murder in the First Degree . . . . |
| Count IV | Use of a Deadly Weapon to Commit a Felony . . . . |
| Count V | Attempted Murder in the Second Degree . . . . |
| Count VI | Attempted Robbery . . . . |
| Count VII | Use of a Deadly Weapon to Commit a Felony . . . . |
| Count III | Criminal Conspiracy . . . . |

Counts II, IV, and VII involve use of a deadly weapon to commit a felony.

The written order then set forth Ramirez' sentences as follows:

| Count I | Life imprisonment without the possibility of parole |
| Count II | 12 - 15 years consecutive to Count I only |
| Count III | Life imprisonment without the possibility of parole |
| Count IV | 12 - 15 years consecutive to Count III only |
| Count V | 12 - 20 years concurrent with all |
| Count VI | 12 - 15 years concurrent with all but Count VII |
| Count VII | 12 - 15 years consecutive to Count VI only |
| Count VIII | 12 - 15 years concurrent with all |

At the sentencing hearing, the district court judge pronounced Ramirez' sentences by stating:

It'll be the sentence and judgment of the Court on Count 1 that [Ramirez] be incarcerated through the Department of Correctional Services for murder in the first degree to a term of life imprisonment.

Under Count 2, the use of a deadly weapon to commit that felony, it will be the sentence and judgment of the Court that he be incarcerated for a period of 12 to 15 years. *The statute . . . requires the sentence to be served consecutive to the underlying conviction.*

Count 3, murder in the first degree, it will be the sentence and judgment of the Court that [Ramirez] be imprisoned for life.

Under Count 4, [the use of a deadly weapon to commit the felony of murder in the first degree,] it will be the sentence and judgment of the Court that [Ramirez] be incarcerated for an indeterminate period of 12 to 15 years, and *the statute requires that that sentence be served consecutive to the underlying conviction.*

On Count 5, attempted murder in the second degree, it will be the sentence and judgment of the Court that [Ramirez] be incarcerated for an indeterminate period of 12 to 20 years in prison.

Under Count 6, the attempted robbery, it will be the sentence and judgment of the Court that [Ramirez] be incarcerated for a period of 12 to 15 years.

Under Count 7, use of a deadly weapon to commit the felony in Count 6, it'll be the sentence and judgment of the Court that [Ramirez] be incarcerated for an indeterminate period of 12 to 15 years *consecutive to Count 6 only.*

Under Count 8, the criminal conspiracy, it will be the sentence and judgment of the Court that [Ramirez] be incarcerated through the Department of Correctional Services for an indeterminate period of 12 to 15 years.

Now, *the sentences in Counts 1 and 2 are, for record purposes, imposed concurrent with the sentences in Counts 3 and 4 and with Counts 5 and 6. Count 5 is a sentence that's concurrent with other convictions.*

*Count 6, the attempted robbery, is concurrent with the —
all but Count 7*. And Count 8, the criminal conspiracy, the
sentence there is *concurrent with all of the others*.

(Emphasis supplied.)

[16] With respect to the three sentences for the convictions
of use of a deadly weapon, the record shows that the district
court has a misperception of the law. Section 28-1205(3) con-
cerns the crimes of use of a deadly weapon and provides: "The
crimes defined in this section shall be treated as separate and
distinct offenses from the felony being committed, and sen-
tences imposed under this section shall be consecutive to any
other sentence imposed." Although it is generally within the
trial court's discretion to direct that sentences imposed for sep-
arate crimes be served concurrently or consecutively, we have
long held that § 28-1205(3) does not permit such discretion
in sentencing, because it mandates that a sentence for the use
of a deadly weapon in the commission of a felony be served
consecutively to any other sentence imposed and concurrent
with no other sentence. See *State v. Sorenson*, 247 Neb. 567,
529 N.W.2d 42 (1995). See, also, *State v. Thomas*, 268 Neb.
570, 685 N.W.2d 69 (2004); *State v. Decker*, 261 Neb. 382,
622 N.W.2d 903 (2001); *State v. Wilson*, 16 Neb. App. 878, 754
N.W.2d 780 (2008).

Because § 28-1205(3) mandates that the sentence imposed
for a conviction of use of a deadly weapon be consecutive
to any other sentence and concurrent with no other sentence,
the district court did not have the authority to order that the
sentences for the convictions of use of a deadly weapon to
commit a felony, counts II, IV, and VII, run consecutively
only to the sentences for the underlying felony offenses.
Furthermore, the district court erred when it imposed the fol-
lowing sentences to run concurrently with the sentences for
the convictions involving use of a deadly weapon: count V,
attempted second degree murder, 12 to 20 years' imprison-
ment "concurrent with all"; count VI, attempted robbery, 12 to
15 years' imprisonment "concurrent with all but Count VII";
and count VIII, criminal conspiracy, 12 to 15 years' imprison-
ment "concurrent with all." The district court did not have
the authority to order that the sentences for counts V, VI, and

VIII run concurrently with any sentences for use of a deadly weapon, and the sentences imposed for counts V, VI, and VIII constitute plain error.

[17] An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *State v. Gunther*, 271 Neb. 874, 716 N.W.2d 691 (2006); *State v. Wilson, supra*. Therefore, we vacate the sentences imposed in counts II, IV, and VII for the convictions of use of a deadly weapon, and vacate the sentences imposed for count V, attempted second degree murder; count VI, attempted robbery; and count VIII, criminal conspiracy, and remand the cause with directions that the district court resentence Ramirez such that each sentence for the conviction of use of a deadly weapon runs consecutively to any other sentences imposed and not concurrently with any other sentence and that the sentences for counts V, VI, and VIII not be ordered served concurrently with any sentence for use of a deadly weapon.

## CONCLUSION

We determine that the district court did not abuse its discretion when it received exhibit 259 and Landell's related testimony into evidence. The district court's subsequent ruling to withdraw exhibit 259 was not an abuse of discretion. Accordingly, the district court did not err when it denied Ramirez' motion for mistrial based on rulings surrounding exhibit 259 and, therefore, it did not err when it denied his motion for new trial on this basis. We further determine that the district court did not abuse its discretion when it received exhibit 224. Thus, it did not err when it denied Ramirez' motion for mistrial based on the admission of exhibit 224 and, therefore, did not err when it denied his motion for new trial on this basis. Ramirez' convictions are affirmed.

We conclude that the life sentences mandatorily imposed upon Ramirez for counts I and III were effectively life imprisonment sentences without the possibility of parole and unconstitutional under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Accordingly, we vacate those unconstitutional sentences and remand the cause

for resentencing in accordance with L.B. 44, as codified at § 28-105.02.

Upon our review of the record, we find plain error in the district court's sentencing order, which ordered that the three sentences for the convictions of use of a deadly weapon to commit a felony, counts II, IV, and VII, run concurrently with any other sentence. We also find plain error in the district court's sentencing order, which ordered that the sentences for the convictions of count V, attempted second degree murder; count VI, attempted robbery; and count VIII, criminal conspiracy, run concurrently with the sentences for use of a deadly weapon. We therefore vacate the sentences for counts II, IV, V, VI, VII, and VIII, and remand the cause to the district court with directions to resentence Ramirez on all these counts, so that each sentence for the conviction of use of a deadly weapon runs consecutively to all other sentences and concurrently with no sentence.

Convictions affirmed, all sentences vacated,
and cause remanded for resentencing.